UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LAURA E. ROBERTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:10CV2079 TIA |
| | ) | |
| MICHAEL ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves an application for Disability Insurance Benefits under Title II of the Social

Security Act.  Claimant has filed a Brief in Support of his Complaint; the Commissioner has filed a

Brief in Support of his Answer. The parties consented to the jurisdiction of the undersigned

pursuant to 28 U.S.C. § 636(c).

**I.      Procedural History**

On October 8, 2008, Claimant filed an Application for Disability Insurance Benefits under

Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 92-107)[1] alleging disability since October 1,

2008 due to depression, anxiety, migraine headaches, vision loss, and high blood pressure.  (Tr.

48).  The application was denied (Tr. 48-52, 108), and Claimant subsequently requested a hearing

before an Administrative Law Judge ("ALJ").  (Tr. 46).  On January 25, 2010, a hearing was held

before an ALJ.  (Tr. 26-45).  Claimant testified and was represented by counsel.  (Id. at 24-39).

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer.
(Docket No. 12/filed July 7, 2011).

Vocational Expert Delores Gonzalez also testified at the hearing.  (Tr. 40-44, 87-90).  In a decision dated February 25, 2010, the ALJ found that Claimant had not been under a disability as defined by the Social Security Act.  (Tr. 6-21).  The Appeals Council denied Claimant's Request for Review on September 8, 2010.  (Tr. 1-5).  Thus, the ALJ's decision is the final decision of the Commissioner.

## II.  Evidence Before the ALJ

### A.  Hearing on January 5, 2010

#### 1.  Claimant's Testimony

At the hearing on January 5, 2010, Claimant testified in response to questions posed by the ALJ and counsel.  (Tr. 28-39).  Claimant is forty-four years old and completed high school.  (Tr. 28-29).  Claimant has a CNA that is not current.  (Tr. 29).  Claimant stands at five feet two inches and weighs 180 pounds.  (Tr. 31).  Claimant lives with her husband who retired from the Union.  (Tr. 34).  Claimant's husband has a pension and is on disability.  Claimant's husband helps take care of the baby.  (Tr. 34).

Although Claimant has a driver's license, she does not want to drive because of her anxiety, depression, and crying spells.  (Tr. 35).  Claimant's counsel noted how she had been crying at the hearing.  Claimant testified that she cries daily, on and off, and sometimes fro twenty minutes.  (Tr. 35).  Claimant testified that she does not like being around people, because she is scared of their criticism.  (Tr. 36).

Claimant worked as a dental assistant.  (Tr. 29).  Thereafter, Claimant worked as a cafeteria manager in the Ferguson School District, but she left the position.  Her duties included computer work and supervising three employees.  (Tr. 29-30).  When she first started the job,

Claimant lifted thirty pounds.  (Tr. 30).  Claimant became pregnant and had preeclampsia and

stopped working, because she was on bed rest.  (Tr. 31).

Claimant testified that she has a history of asthma and uses inhalers and a nebulizer once a

day as treatment.  (Tr. 31).  In July 2007, Claimant had an EMG and a nerve conduction study of

her legs because of the numbness and tingling she experienced on the top of her feet.  (Tr. 32).

Claimant testified that Dr. Hicks treated Claimant for her anxiety and crying spells.  (Tr. 33).

Claimant testified that she has a fear of people.  (Tr. 33).  Claimant testified that she has a

headache every day.  (Tr. 36).  Pushing, pulling, lifting and eating certain foods can cause a

headache.  (Tr. 36).  Claimant has stress incontinence and bladder instability.  (Tr. 37).  Claimant

testified that she is supposed to have surgery, but she has delayed the surgery because after the

surgery she cannot lift more than five pounds.  Claimant testified that she is waiting until her son

is older before having the surgery.  (Tr. 37).  Claimant has been diagnosed with Chron's disease

and takes Elmiron as treatment.  (Tr. 38).  The ALJ pointed out that there is no diagnostic study

supporting the diagnosis.  (Tr. 39).

### 2.  Testimony of Vocational Expert

Vocational Expert Delores Gonzalez, a vocational rehabilitation counselor, testified in

response to the ALJ's questions.  (Tr. 40-44).  Ms. Gonzalez listened to the testimony during the

hearing and reviewed the vocational evidence in the file. (Tr. 40).

The ALJ asked Ms. Gonzalez to assume the following:

A hypothetical claimant, aged 43, who has the date of onset with at the amended
date of onset with 12 years of education, and CNA course, same past work
experience.  It's been opined in the first one that this hypothetical claimant could
lift and carry 50 pounds occasionally, 25 pounds frequently, stand or walk for two
hours out of eight, sit for six hours out of eight, should never climb ropes, ladders,

and scaffolds, and should avoid concentrated exposure to fumes, odors, dusts and gases, and the hazards of unprotected heights.  In addition, this hypothetical claimant is able to understand and remember and carry out at least simple instructions and non-detailed tasks, can respond appropriately to supervisors and co-workers in a task oriented setting, where contact with others is casual and infrequent.  Can take appropriate precautions to avoid hazards, and should not work in a setting which includes constant or regular contact with the general public.  Given these restrictions, and those alone, could this hypothetical claimant return to any past relevant work?

(Tr. 40).  Ms. Gonzalez responded that such hypothetical claimant could not return to any past

relevant work.  (Tr. 40).  Examples of other work the hypothetical claimant could perform  would

be an addresser, a sedentary unskilled job with 153,530 jobs nationally, 4,100 jobs in Missouri,

and 1,260 jobs in the St. Louis metropolitan area.  (Tr. 41).  The ALJ corrected the hypothetical

so that the hypothetical claimant could stand and walk six hours of eight and sit for six hours of

eight hours.  Ms. Gonzalez cited examples of other medium work the hypothetical claimant could

perform would be a pleater, a medium unskilled job with 280,160 jobs nationally, 6,320 jobs in

Missouri, and 2,900 jobs in the St. Louis metropolitan area; and a stretch box tender, with

285,160 jobs nationally, 6,900 in Missouri, and 3,200 jobs in the St. Louis metropolitan area.  (Tr.

41).

Next, the ALJ asked Ms. Gonzalez to alter the hypothetical so that the claimant could lift

twenty pounds occasionally and ten pound frequently.  (Tr. 42).  Ms. Gonzalez opined that such

person could perform light work as an assembler, light unskilled work with 288,470 jobs

nationally, 4,840 jobs in Missouri, and 3,550 jobs in the St. Louis metropolitan area and a pan

greaser, a light unskilled job, with 285,160 jobs nationally, 6,888 in Missouri, and 2,300 in the St.

Louis metropolitan area.  (Tr. 42).

Next, the ALJ asked Ms. Gonzalez to consider the RFC completed by Dr. Hicks.  (Tr.

- 4 -

42).  The ALJ asked whether the two boxes he checked, unable to meet competitive standards

where dealing with stress of semi-skilled and skilled work and setting realistic goals for making

plans independently of others, would preclude performance of any of the jobs she discussed in her

answers as simple, unskilled work.  Ms. Gonzalez indicated no and noted that her testimony had

been consistent with Gonzalez whether she checked characteristics of Occupation Donna Hicks RFC would affect

a claimant's ability to perform the jobs in her testimony at the hearing.  (Tr. 43).  Ms. Gonzalez

noted that the limitations of traveling to unfamiliar places, using public transportation, carrying

out detailed instructions, getting along with co-workers because the jobs that she cited would not

require talking, and such jobs are unskilled positions.  Ms. Gonzalez opined that she believed the

person could perform the jobs she cited with the restrictions placed by Dr. Hicks as seriously

limited but not precluded.  (Tr. 43).  Ms. Gonzalez agreed that if the hypothetical claimant had

marked limitations in ability to maintain regular attendance and to be punctual, to sustain an

ordinary work routine, to work in coordination with others, to make simple work-related

decisions, to complete a normal workday without interruptions, and to perform a consistent pace

there would not be any jobs such claimant could perform.  (Tr. 44).  When asked to consider the

ALJ's first hypothetical and add the limitation of missing more than three work days per month

due to symptoms, Ms. Gonzalez opined that there would be competitive employment.  (Tr. 44).

## III.   Medical and Other Records

On January 16, 2008, Claimant reported feeling a little better and distressed about her

recent disability evaluation.  (Tr. 322).  Dr. Hicks continued Claimant's medication regimen and

encouraged Claimant to seek counseling.  (Tr. 322).

On February 8, 2008, Claimant received treatment in the emergency room at St. Luke's

Hospital for anxiety disorder.  (Tr. 200).  Claimant reported having a headache in the frontal lobe.
(Tr. 204).  Claimant smokes one package of cigarettes a day.  (Tr. 205).  The treating doctor
observed Claimant to be mildly distressed and extremely anxious.  (Tr. 205).  The discharging
doctor directed Claimant to seek follow-up treatment with Dr. Benzaquen.  (Tr. 203, 207).  The
x-ray of Claimant's chest showed no infiltration, consolidation, pleural effusion, mass or
pheumothorax.  (Tr. 211).  The MRI of Claimant's brain revealed negative results.  (Tr. 212).

In the initial office visit on March 6, 2008, Claimant reported daily headaches.  (Tr. 219).
As treatment, Dr. Max Benzaquen prescribed Topamax.  (Tr. 220).

Claimant received treatment for her headaches in an office visit on May 9, 2008.  (Tr.
218).  Claimant reported not taking the Topamax due to side effects of the medication.  Dr.
Benzaquen ordered a CT of the brain with contrast to check for hypotensive headache features.
(Tr. 218).  The May 15, 2008 MRI of Claimant's brain revealed non-specific foci of
hyperintensity of T2 weighted and flair images within the white matter of the cerebral hemispheres
and pons which may be seen in the setting of demyelinating disease, small vessel disease, and
chronic migraine.  (Tr. 214, 216, 228).

In a follow-up visit on May 23, 2008, Dr. Benzaquen noted that Claimant did not tolerate
Topamax and that the CT of her brain showed white matter nonspecific hyper intensities.  (Tr.
217).  Dr. Benzaquen continued her medication regimen of Lexapro for anxiety and Imitrex for
headaches.  (Tr. 217).

On August 27, 2008, Dr. F. G. Hicks evaluated Claimant at ABC Allied Behavioral
Consultants.  (Tr. 258, 345).  Claimant reported not having previous psychiatric treatment and
struggling with anxiety, bowel disturbance, atypical chest pain, fatigue, and prominent low mood

in the post partum.  (Tr. 258, 345).  Claimant reported smoking one package of cigarettes a day.

(Tr. 259, 346).  Claimant indicated with respect to recreation, she is learning about her new boat.

(Tr. 259, 346).  Dr. Hicks observed Claimant to have good eye contact and to be tearful and her

insight and judgment to be fair.  (Tr. 259-60, 346-47).  Dr. Hicks diagnosed Claimant with major

depression, possible dependent personality disorder, hypertension, obesity, and asthma and

prescribed Lorazepam and Trileptal as treatment and encouraged Claimant to seek counseling.

(Tr. 260, 347).

On September 9, 2008, Claimant reported being in fair spirits and having trouble tolerating

Trileptal.  (Tr. 257, 348).  Claimant also reported getting "so sunburnt Memorial day weekend."

(Tr. 257, 348).  Dr. Hicks observed Claimant to have good eye contact, to be conversant and

briefly tearful.  Dr. Hicks assessed her GAF to be 55/65, encouraged additional counseling, and

prescribed Lorazepam.  (Tr. 257, 348).

In a follow-up visit on September 24, 2008, Claimant reported not yet contacting a

counselor and admitted taking Lorazepam 2 tid prescribed by Dr. Howell.  (Tr. 256, 349).  Dr.

Hicks noted Claimant to be ambivalent about treatment and encouraged a reduction in dosing of

Lorazepam and Diazepam and additional counseling.  (Tr. 256, 349).

On October 28, 2008, Claimant reported anxiety and panic disorder and having an

emotional breakdown at work and not willing to return to work.  (Tr. 262).  Dr. Paletta

diagnosed Claimant with panic attacks, depressive disorder, anxiety disorder, diabetes, and

hypertension.  (Tr. 262).

On October 31, 2008, Claimant reported feeling downcast and not being able to work

anymore.  (Tr. 283, 350).  Claimant indicated she plans to seek additional counseling.  Dr. Hicks

noted Claimant to have good eye contact and to be intermittently tearful.  Dr. Hicks prescribed

Lorazepam, Diazapem, and Amitriptyline and encouraged additional counseling.  (Tr. 283, 350).

In a follow-up visit on November 14, 2008, Claimant reported feeling downcast with easy

tearfulness.  (Tr. 285, 351).  Claimant reported sleeping better with less intrusive thoughts and

being busy caring for her son and having fair interaction with her husband.  Dr. Hicks continued

Claimant's medication regimen and encouraged additional counseling.  (Tr. 285, 351).

In the treatment note of December 2, 2008, a notation reflects that Dr. Donna Robey's

office contacted Claimant and explained that Dr. Robey would not sign disability papers for

anxiety-depression disorder, but that Claimant would have to see a psychiatrist.  (Tr. 287).

On December 12, 2008, Claimant reported being downcast and needing an additional

evaluation for disability.  (Tr. 292, 352).  Claimant reported tolerating the low dose of

amitriptyline but having lost the prescription while Christmas shopping and as a result, missing

three days of the medication.  Dr. Hicks continued her medication regimen and encouraged

seeking additional counseling.  (Tr. 292, 352).

In the December 16, 2008 treatment record from Depaul Health Center, Claimant

reported having medical insurance through Commercial 1 Primary.  (Tr. 297).  Claimant received

treatment for asthma and shortness of breath and advised not to smoke.  (Tr. 298-99).

On January 14, 2009 on referral by Disability Determinations, Dr. Martin Russo

completed an evaluation to assess Claimant's mental status.  (Tr. 317).  Dr. Russo noted that

Claimant arrived alone for the evaluation, and she readily participated.  Dr. Russo observed

Claimant to be neatly dressed.  (Tr. 317).  Claimant reported working as a school cafeteria

manager for nine years until quitting her job in October 2008, because of her psychiatric problems

were interfering with her job performance.  (Tr. 318).  Claimant reported missing work due to

hospital visits for treatment of heart attack symptoms caused by her anxiety.  Claimant reported

losing other jobs because of her psychiatric problems.  Dr. Russo noted Claimant has no history of

therapy or inpatient psychiatric treatment and having been treated by a psychiatrist on an

outpatient basis with various medications.  (Tr. 318).  Dr. Russo noted Claimant to appear to be

of low average cognitive ability based on his screening and to be alert and oriented.  (Tr. 319).

Dr. Russo noted Claimant to be overtly depressed throughout the evaluation and crying several

times.  Claimant reported trying to stay away from people.  (Tr. 319).  Dr. Russo opined that

Claimant's depression and anxiety impact her social functioning and her ability to function in a

job.  (Tr. 320).

   In a follow-up visit on January 16, 2009, Claimant reported feeling a little better and

having a fair benefit with amitriptyline.  (Tr. 353).  Dr. Hicks continued Claimant's medication

regimen and urged Claimant to seek additional counseling.  (Tr. 353).  On January 30, 2009, Dr.

Hicks adjusted the dosage of Claimant's medications.  (Tr. 354).

   In the Psychiatric Review Technique dated February 18, 2009, Lester Bland, Psy.D.,

found Claimant to have affective disorders, anxiety-related disorders, somatoform disorders, and

personality disorders but no impairment to be severe and not expected to last twelve months.  (Tr.

324-35).  Dr. Bland found Claimant's affective disorder to be recurrent major depression.  (Tr.

327).  With respect to anxiety-related disorders, Dr. Bland noted Claimant has a persistent

irrational fear and recurrent severe panic attacks.  (Tr. 328).  With respect to personality

disorders, Dr. Bland found Claimant to have persistent disturbances of mood and affect and

pathological dependence.  (Tr. 329).  In the Rating of Functional Limitations, Dr. Bland found

- 9 -

Claimant to have moderate degree of limitations in restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.  (Tr. 332).  In support, Dr. Bland opined that the alleged onset date does not appear supported from perspective of marked impairments, and that Dr. Russo affirms present marked deficits but reasonable to assume the Claimant would improve with treatment so that Claimant has not established duration.  (Tr. 335).  With respect to severity/allegation credibility, Dr. Bland noted that Dr. Hick, a treating source, indicated only moderate level of deficits and noted response to treatment.  (Tr. 335).

In the Mental Residual Functional Capacity Assessment completed on February 18, 2009, for the twelve months after onset date of January 2010, Dr. Bland found Claimant's understanding and memory not to be significantly limited.  (Tr. 336).  Dr. Bland found Claimant's sustained concentration and persistence not to be significantly limited except in her ability to carry out detailed instructions, she is moderately limited.  (Tr. 336).  Dr. Bland found Claimant's social interactions not be significantly limited except in her ability to interact appropriately with the general public, she is moderately limited.  (Tr. 337).  Dr. Bland found Claimant's adaptation not to be significantly limited except in her ability to respond appropriately to changes in the work setting, she is moderately limited.  (Tr. 337).

In the Physical Residual Functional Capacity Assessment completed on February 18, 2009, Mary Vereburgt, a medical consultant, listed asthma as Claimant's primary diagnosis, migraine headaches as his secondary diagnosis, and high blood pressure as his other alleged impairments. (Tr. 339).  The consultant indicated that Claimant can occasionally lift fifty pounds, frequently lift twenty five pounds, and stand and walk about six hours in an eight-hour workday.  (Tr. 340).

- 10 -

The consultant noted that Claimant can sit about six hours in an eight-hour workday and has unlimited capacity to push and/or pull other than shown. As the evidence in support, the consultant noted that based on the medical evidence, Claimant's asthma, high blood pressure, and migraines are controlled with prescription treatment. (Tr. 341). The consultant found Claimant's allegations not to be fully credible. (Tr. 341). The consultant indicated that Claimant has no established postural, manipulative, visual, or communicative limitations. (Tr. 342-43). With respect to environmental limitations, the consultant found that Claimant should avoid concentrated exposure to extreme cold and fumes, odors, dusts, gases, and poor ventilation inasmuch as these would exacerbate Claimant's asthma. (Tr. 343).

In a follow-up visit on February 20, 2009, Claimant reported being in fair spirits and struggling with getting out of the house. (Tr. 355). Dr. Hicks adjusted the dosage of her medications and urged Claimant to seek additional counseling. (Tr. 355). In the treatment note of March 2, 2009, Claimant indicated that she has no money problems. (Tr. 356). On March 25, 2009, Claimant reported being downcast. (Tr. 398).

On April 8, 2009, Claimant reported tolerating her medications without incident. (Tr. 397). In a follow-up visit on April 29, 2009, Claimant reported being in fair spirits and tolerating her medication without incident. (Tr. 396).

On May 27, 2009, Claimant reported being distressed with recent diagnosis of Crohn's. (Tr. 395). Dr. Hicks continued her medication and encouraged her to seek additional counseling. Dr. Hicks assessed Claimant's GAF to be 55/65. (Tr. 395).

In the Mental Residual Functional Capacity Questionnaire completed on June 22, 2009, Dr. Hicks  noted that he started treating Claimant on August 27, 2008 and last treated her on May

27, 2009.  (Tr. 363).  Dr. Hicks noted her current GAF to be 55 and Claimant's response to treatment and prognosis to be fair.  (Tr. 363).  In assessing Claimant's Mental Abilities and Aptitudes Needed to do Unskilled Work, Dr. Hicks opined Claimant to be seriously limited but not precluded from maintaining regular attendance, sustaining ordinary routine, working in coordination with others without being unduly distracted, making simple work-related decisions, completing a normal work day or work week without interruption from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length, and getting along with co-workers.  (Tr. 365).  Dr. Hicks found Claimant has a limited but satisfactory ability to remember work-like procedures, understand, remember, and carry out short and simple instructions, maintain attention for tow-hour segments, ask simple questions or request assistance, accept instructions and respond appropriately to criticism for supervisors, respond appropriately to changes in a routine work setting, deal with normal work stress, and be aware of normal hazards and take appropriate precautions.  (Tr. 365).  With respect to Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work, Dr. Hicks opined Claimant to be unable to meet competitive standards in setting realistic goals and dealing with stress or semiskilled and skilled work.  (Tr. 366).  With respect to Mental Abilities and Aptitude Needed to do Particular Types of Jobs, Dr. Hicks opined Claimant to be seriously limited but not precluded from traveling in unfamiliar places and using public transportation.  (Tr. 366).  Dr. Hicks indicated that Claimant would miss three days of work each month.  (Tr. 367).  As additional reasons why Claimant would have difficulty working at a regular job on a sustained basis, Dr. Hicks noted Claimant to be easily distracted and overly emotional.  (Tr. 367).

In the Mental Residual Functional Capacity Questionnaire completed on June 23, 2009,

Dr. Howell noted that he started treating Claimant on December 30, 2003 and last treated her on October 30, 2008. (Tr. 369). Dr. Howell listed asthma, hypertension, panic disorder, major depression with psychotic features as Claimant's diagnosis. With respect to clinical findings and objective signs, Dr. Howell listed bronchospasm and hypertension, and noted Claimant being treated by psychiatrist, and he is unaware of the doctor's diagnosis or treatment. (Tr. 369). Dr. Howell opined Claimant to be incapable of tolerating work stress in even low stress jobs because she cannot interact with coworkers. (Tr. 370). Dr. Howell indicated that Claimant would miss more than four days each month as a result of her impairments or treatment. (Tr. 372).

On June 24, 2009, Claimant reported she had not started counseling due to financial restraints. (Tr. 394). Dr. Hicks assessed Claimant's GAF to be 55/65. Dr. Hicks continued her medications. (Tr. 394).

During an office visit on July 22, 2009, Claimant reported being distressed and not sleeping well. (Tr. 393). Dr. Hicks' diagnosis included major depression, recurrent, social phobia, dependent personality disorder, and hypertension. Dr. Hicks added Abilify to Claimant's medication regimen. (Tr. 393).

In a follow-up visit on August 10, 2009, Claimant reported being in fair spirits, having "some enjoyment with recent weekend at Ameristar" and being able to "pay the taxes on my camper now." (Tr. 392). Dr. Hicks assessed Claimant's GAF to be 55/65. Dr. Hicks prescribed medications as treatment. (Tr. 392).

On September 22, 2009, Claimant reported being concerned about her marriage. (Tr. 391). Dr. Hicks continued her medication regimen and encouraged Claimant to seek additional counseling. (Tr. 391).

- 13 -

In a follow-up visit on November 3, 2009, Claimant reported feeling "downcast with her interaction with the IRS over her mother's estate." (Tr. 390). Dr. Hicks assessed Claimant's GAF to be 55/65. Dr. Hicks continued Claimant's medication regimen. (Tr. 390).

In the Function Report - Adult, Claimant noted how she tries to get out of bed without crying, and her depression and anxiety prevents her from functioning. (Tr. 122). Claimant noted that her fear of people prevents her from leaving the house. Claimant tries to cook and clean daily but most of the time, she goes back to bed and cries. (Tr. 122). Claimant cares for a small dog. (Tr. 123). Claimant prepares sandwiches and frozen dinners. (Tr. 124). Claimant reported leaving the house only when she has to do so. (Tr. 125). Claimant indicated that she never goes out to spend money. (Tr. 126). Claimant noted that she does not go anywhere. (Tr. 126).

On December 1, 2009, Claimant reported being in fair spirits after taking "a three week trip" in Branson. (Tr. 399). Claimant enjoyed visiting with her family and camping. Dr. Hicks assessed her GAF to be 55/65 and continued her medications. (Tr. 399).

## IV.     The ALJ's Decision

The ALJ found that Claimant met the insured status requirements of the Social Security Act through December 31, 2012. (Tr. 11). The ALJ found that Claimant has not engaged in substantial gainful activity since October 1, 2008, the alleged onset date of disability. The ALJ found that the medical evidence establishes that Claimant has the following severe impairments: asthma, major depressive disorder, idiopathic inflammatory bowel disease, somatization disorder, and obesity, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 11). After careful consideration of the entire record, the ALJ found Claimant has the residual functional capacity to perform light work

except she must avoid concentrated exposure to fumes, odors, dusts, and gases and the hazards of unprotected heights; and never climb ropes, ladders or scaffolds.  The ALJ found that Claimant can understand, remember and carry out at least simple instructions and non-detailed tasks, respond to supervisors and coworkers in a task oriented setting where contact with others is casual and infrequent, can take appropriate precautions to avoid hazards and should not work in a setting that includes constant or regular contact with the general public.  (Tr. 12).  The ALJ found that Claimant is unable to perform any past relevant work.  (Tr. 19).  The ALJ noted that Claimant's date of birth is September 13, 1965 thus she is a younger individual age 18-49, on the alleged disability onset date.  The ALJ noted that Claimant has a high school education and is able to communicate in English.  The ALJ opined that transferability no to be material to the determination of disability inasmuch as using the Medical-Vocational Rules supports a finding the Claimant is not disabled whether or not she has transferrable job skills.  (Tr. 19).  Considering Claimant's age, education, work experience, and residual functional capacity, the ALJ found there to be jobs existing in significant numbers in the national economy that Claimant can perform.  (Tr. 20).  The ALJ found that Claimant has not been under a disability from October 1, 2008 through the date of the decision.  (Tr. 20).

## V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the

claimant will be found to have a disability "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

　　　The Commissioner has promulgated regulations outlining a five-step process to guide an

ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the

individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for

disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which

asks whether the individual has a "severe impairment" that "significantly limits [the claimant's]

physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is

not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is

found to have a severe impairment the ALJ proceeds to step three in which he must determine

whether the impairment meets or is equal to one determined by the Commissioner to be

conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment,

the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed or is

not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the

claimant is capable of doing past relevant work.  If the claimant can still perform past work, she is

not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ

proceeds to step five in which the ALJ determines whether the claimant is capable of performing

other work in the national economy.  In step five, the ALJ must consider the claimant's "age,

education, and past work experience."  Only if a claimant is found incapable of performing other work in the national economy will she be found disabled.  20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id.  The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The claimant's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the claimant's impairments.

6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

- 17 -

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly formulate his RFC. Claimant also contends that the ALJ failed to properly evaluate the opinion evidence of Dr. Howell.

A.     Residual Functional Capacity

With regard to the ALJ's determination of Claimant's RFC, the undersigned finds that the ALJ properly assessed the medical evidence and Claimant's credibility.  "The ALJ must determine a claimant's RFC based on all of the relevant evidence."  Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004).  It is the responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of treating and examining physicians, as well as the claimant's own statements regarding his limitations.  McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003); McKinney v. Apfel, 228 F.3d 860 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).  "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individuals's strengths and weaknesses."  SSR 85-16.  SSR 85-16 further delineates that "consideration should be given to ... the [q]uality of daily activities ... [and the a]bility to sustain activities, interests, and relate to others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered."  SSR 85-16.

An ALJ must begin his assessment of a claimant's RFC with an evaluation of the credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function.  See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Pearsall, 274 F.3d at 1218.  In making a credibility determination, an ALJ may discount subjective complaints if they are inconsistent with the record as a whole.  Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  In Polaski, the Eighth Circuit set out factors for an ALJ to consider when determining the credibility of a claimant's subjective complaints.  The

- 19 -

ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review."  Harris v. Shalala, 45 F.3d 1190. 1193 (8th Cir. 1995).  However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically.  The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  See also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).  An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining a claimant's RFC.  See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record." )

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Similarly, in making a finding of residual functional capacity, an ALJ may

consider non-medical evidence, although the residual functional capacity finding must be supported by some medical evidence.  See Lauer, 245 F.3d at 704.

After considering the medical evidence and Claimant's subjective complaints, the ALJ found Claimant to have the residual functional capacity to perform light work except she must avoid concentrated exposure to fumes, odors, dusts, and gases and the hazards of unprotected heights; and never climb ropes, ladders or scaffolds.  The ALJ found that Claimant can understand, remember and carry out at least simple instructions and non-detailed tasks, respond to supervisors and coworkers in a task oriented setting where contact with others is casual and infrequent, can take appropriate precautions to avoid hazards and should not work in a setting that includes constant or regular contact with the general public.

As noted by Claimant, Dr. Hicks completed a RFC questionnaire in June 2009 wherein he found Claimant would be absent from work three days a month due to her mental impairments or treatment.  Dr. Hicks noted her current GAF to be 55, and Claimant's response to treatment and prognosis to be fair.  In assessing Claimant's Mental Abilities and Aptitudes Needed to do Unskilled Work, Dr. Hicks opined Claimant to be seriously limited but not precluded from maintaining regular attendance, sustaining ordinary routine, working in coordination with others without being unduly distracted, making simple work-related decisions, completing a normal work day or work week without interruption from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length, and getting along with co-workers. Dr. Hicks found Claimant has a limited but satisfactory ability to remember work-like procedures, understand, remember, and carry out short and simple instructions, maintain attention for tow-hour segments, ask simple questions or request assistance, accept instructions and respond

- 21 -

appropriately to criticism for supervisors, respond appropriately to changes in a routine work setting, deal with normal work stress, and be aware of normal hazards and take appropriate precautions.  Thus, with respect to any of the mental abilities or aptitudes required for unskilled work, Dr. Hicks never found Claimant unable to meet competitive standards or had no useful ability to function.  In formulating the RFC, the ALJ afforded considerable weight to Dr. Hicks' opinion and incorporated only those limitations supported by and consistent with the record.  As found by the ALJ, Dr. Hicks' RFC did not preclude simple work.

In his treatment notes, Dr. Hicks found Claimant's mental impairments to be moderate, and he assessed her GAF score as 55/65.  GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV 30-34.  A GAF of 51 to 60 represents moderate difficulty in social and or occupational functioning.  A GAF of 61-70 corresponds with some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well.  Id.  Thus, GAF scores in the range of 55/65 "indicate an individual with mild symptoms or an individual with moderate difficulty."  See Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010) (finding no impairment when GAF scores between 52 and 60, taken as a whole, indicated she had moderate symptoms of moderate difficulty in social or occupational function); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (GAF scores between 51 and 60 contradict assertion of severe mental impairments; evidence in the record that "antidepressant medication helped her symptoms, and her medical records indicate she was stable on medication.").

The ALJ properly considered Dr. Hicks' treatment records showing Claimant engaged in

activities inconsistent with the presence of disabling mental limitations.  Claimant reported going

Christmas shopping in December2008.  In August 2009, Claimant reported spending the weekend

gambling at the casino and winning enough money to "pay the taxes on my camper now."  During

a number of visits, Dr. Hicks observed Claimant to be conversant and having good eye contact.

In December 2009, Claimant reported taking "a three week trip" in Branson and enjoying visiting

with her extended family and camping.  The ALJ was within his discretion to consider Claimant's

self-reported activities.  Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("The ALJ

may discount subjective complaints of physical and mental health problems that are inconsistent

with medical reports, daily activities, and other such evidence."); Riggins v. Apfel, 177 F.3d 689,

693 (8th Cir. 1999) (finding that activities such as driving, shopping, watching television, and

playing cards were inconsistent with the claimant's complaints of disabling pain).  The ALJ's

determination of Claimant's RFC is supported by substantial evidence in the record.  Likewise,

the ALJ noted several inconsistencies within the record.

        The substantial evidence on the record as a whole supports the ALJ's decision.  Where

substantial evidence supports the Commissioner's decision, the decision may not be reversed

merely because substantial evidence may support a different outcome.  Woolf v. Shalala, 3 F.3d

1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

        For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the

record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this

Court may not reverse the decision merely because substantial evidence exists in the record that

would have supported a contrary outcome or because another court could have decided the case

differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the

ALJ denying Claimant's claims for benefits should be affirmed.

B.    Weight Given to Treating Doctor

Claimant also contends that the ALJ failed to properly evaluate the opinion evidence of

Dr. Howell.

The undersigned finds that the ALJ was within his discretion to discount the opinion of

Dr. Howell, because he is not a mental health care specialist, and his evidence was inconsistent

with that of the examining psychiatrists and the record as a whole.  See Cantrell v. Apfel, 231

F.3d 1104, 1107 (8th Cir. 2000) (A treating physician's opinion can be discounted where other

medical assessments "are supported by better or more thorough medical evidence.").

As the ALJ acknowledged in his decision, Dr. Howell was Claimant's treating physician.

Dr. Howell's treatment notes are brief and somewhat illegible, but the notes show Dr. Howell

treated Claimant between December 2003 and October 30, 2008 for asthma, hypertension, panic

disorder, major depression with psychotic features.   With respect to clinical findings and

objective signs, Dr. Howell noted Claimant being treated by psychiatrist, and he is unaware of the

doctor's diagnosis or treatment.   Dr. Howell opined Claimant to be incapable of tolerating work

stress in even low stress jobs because she cannot interact with coworkers.  Dr. Howell indicated

that Claimant would miss more than four days each month as a result of her impairments or

treatment.  There are no treatment notes dated June 23, 2009 showing Dr. Howell examined

Claimant or completed any testing on that day, and none of the earlier treatment records contain

any objective evidence of limitation of the degree set forth in the RFC.  The records shows that

Dr. Howell last treated Claimant on October 30, 2008, and Claimant did not allege disability prior

to October 2008.  Indeed, the record shows that Claimant worked full time as a school cafeteria

manager until October 1, 2008.

"A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original).  "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted).  Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)).

Title 20 C.F.R. § 404.1527(d) list six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, the frequency of examination, and the nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record."  20 C.F.R. § 404.1527(d)(1)-(6).  Consideration of these factors supports the ALJ's decision not to give greater weight to Dr. Howell's residual functional capacity assessment.

First, to the extent Dr. Howell opined that Claimant is incapable of working even less stress jobs, a treating physician's opinion that a claimant is not able to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the

Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

The ALJ acknowledged that Dr. Howell was a treating source, but that his opinion was not

entitled to controlling weight because it was not well-supported by medically acceptable clinical

and laboratory techniques and is inconsistent with his prescribed medical treatment. See Travis v.

Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or

contrary to the medical evidence as a whole, the ALJ can accord it less weight."). Moreover, a

brief conclusory assessment from a treating physician stating that the applicant is disabled is not

binding. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) ("Even statements made by a

claimant's treating physician regarding the existence of a disability have been held to be properly

discounted in favor of the contrary medical opinion of a consulting physician where the treating

physician's statements were conclusory in nature."). As noted by the ALJ, Dr. Howell last treated

Claimant on October 30, 2008 and completed the assessment almost eight months later on June

23, 2009.

    The record shows his opinion was not well-supported by medically acceptable clinical and

laboratory techniques. The undersigned notes no examination notes accompanied the assessment.

Opinions of treating doctors are not conclusive in determining disability status and must be

supported by medically acceptable clinical or diagnostic data. Chamberlain v. Shalala, 47 F.3d

1489, 1494 (8th Cir. 1995); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be

given to an opinion when a medical source presents relevant evidence, such as medical signs, in

support of his or her opinion). Dr. Howell's assessment is not supported by objective evidence.

Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to

Dr. Harry's opinion, because it was based largely on Kirby's subjective complaints rather than on

objective medical evidence."). The record does not reflect that Dr. Howell conducted any testing to reach the conclusions set forth in the assessment. While the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995).

Second, Dr. Howell's assessment is inconsistent with his treatment notes. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). An ALJ may "discount or even disregard the opinion of a treating physician ... where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). Indeed, in his treatment notes Dr. Howell never set forth any finding Claimant unable to perform even low stress jobs.

The regulations require the ALJ to assess the record as a whole to determine whether the treating physician's opinions are inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). The undersigned concludes that ALJ did so here and diminished the weight given Dr. Howell's assessment or proper reasons.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case

differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that  the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this   15th   day of March, 2012.